# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

CLIFFORD ZUCKER, not personally, but as )
Liquidation Trustee for the Liquidation Trust of )
Capitol Bancorp Ltd. and Financial Commerce )
Corporation, )
                     )
             Plaintiff, )
                     )
v. )
                     )
JOSEPH D. REID, CRISTIN K. REID, & )
BRIAN K. ENGLISH )
                     )
            Defendants. )

## COMPLAINT

Clifford Zucker, not personally, but as Liquidation Trustee for the Liquidation Trust of

Capitol Bancorp Ltd. and Financial Commerce Corporation, by his counsel, states the following

as his Complaint for Recovery of Damages against Joseph D. Reid, Cristin K. Reid and Brian K.

English (collectively, "Defendants"):

## INTRODUCTION

1.       This lawsuit arises out of the failure of Capitol Bancorp Ltd.'s ("Capitol")

corporate officers to preserve Capitol's assets as it experienced rapid financial decline and

eventual bankruptcy.

2.       Capitol is a banking company, which formerly acted as a bank holding company

with subsidiary banks located in various states.

3.       As corporate officers of Capitol, Defendants Joseph Reid and Cristin Reid

(together, the "Reids") and Brian English ("English") owed Capitol fiduciary duties to act in

Capitol's best interests.

4.      Contrary to acting in good faith and in Capitol's best interest, the Reids and English funneled money out of Capitol and into several failing subsidiary banks from 2011 through 2012. In doing so, the Defendants artificially prolonged the eventual failure of five subsidiary banks and unnecessarily diminished Capitol's own assets.

5.      At the time the Defendants channeled money out of Capitol, Capitol was already under increased regulatory oversight from the Federal Deposit Insurance Corporation ("FDIC") because of its insufficient consolidated level of capital. Additionally, several of Capitol's subsidiary banks had been classified by the FDIC as "significantly undercapitalized" starting in 2011, and were destined for failure.

6.      Despite Capitol's eroded capital position, the Reids made numerous capital infusions to failing subsidiary banks in 2011.

7.      Later, in 2012, Defendants caused Capitol to enter into assignment agreements with some of its subsidiary banks for the purchase of worthless charged off loans.

8.      Defendants caused Capitol to pay a premium for the charged off loans, but oversaw no efforts to collect on the charged off loans after their purchase

9.      Not only did the Reids imprudently transfer assets out of Capitol before Capitol filed for bankruptcy on August 9, 2012, but they also made numerous unauthorized, post-petition transfers to subsidiary banks.

10.     All of the aforementioned transfers were against Capitol's best interest. Capitol's assets have been greatly diminished as a result of Defendants' conduct and Capitol and its shareholders have sustained significant monetary injuries.

2

## THE PARTIES

11.     Capitol Bancorp Ltd. ("Capitol") is a Michigan corporation with its principal place of business at 200 N. Washington Square, Lansing MI 48933. Capitol is a banking company which formerly acted as a holding company of a network of individual, subsidiary banks across seventeen states.

12.     Financial Commerce Corporation ("FCC," and together with Capitol, "Debtors") is a Michigan corporation with its principal place of business at 200 N. Washington Square, Lansing MI 48933. Capitol owns approximately 97% of FCC.

13.     Clifford Zucker is the Liquidation Trustee (the "Trustee") for the Liquidation Trust of Debtors. Pursuant to the confirmed Amended Joint Liquidating Plan of the Debtors (the "Plan"), the Trustee is the representative of Debtors' Estates and empowered to pursue Causes of Action (as defined in the Plan) in the administration and liquidation of Debtors' assets.

14.     The Trustee is a resident of New Jersey, and his principal place of business is located at 333 Thornall St., Edison, NJ 07090.

15.     Joseph D. Reid is a resident of Michigan.  At all relevant times, Joseph D. Reid was the Chief Executive Officer of Capitol.

16.     Cristin K. Reid is a resident of Michigan. At all relevant times, Cristin K. Reid was the Corporate President of Capitol, and daughter of Joseph D. Reid.

17.     Brian K. English is a resident of Michigan. At all relevant times, Brian K. English was Capitol's general counsel, and is the husband of Cristin K. Reid.

18.     As executive officers of Capitol, the Reids were responsible for the day to day operations and management of the Debtors.

3

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this matter because the amount in controversy exceeds $75,000, exclusive of interests and costs, and because this controversy is between citizens of different States.

20.     Pursuant to 28 U.S.C. § 1391, venue is proper because the conduct giving rise to the Trustee's causes of action took place in Lansing, Michigan.

## FACTUAL BACKGROUND

*Procedural History*

21.     On August 9, 2012 (the "Petition Date"), Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Debtors' bankruptcy cases are jointly administered, and pending in the United States Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court").

22.     Debtors operated their businesses and managed their assets as debtors-in-possession pursuant to 1107(a) and 1108 of the Bankruptcy Code until January 29, 2014.

23.     On January 29, 2014, the Bankruptcy Court confirmed the Debtors' Amended Joint Liquidating Plan. Following the confirmation of Debtors' Amended Joint Liquidating Plan, the Trustee assumed all fiduciary responsibilities, duties and obligations previously undertaken by the Debtors, and the Debtors' board of directors and officers.

*Debtors' Business, Pre-Petition Financial Decline and Undercapitalized Subsidiary Banks*

24.     Capitol is a community banking company and a registered bank holding company with the Board of Governors of the Federal Reserve and subject to regulation under the Bank Holding Company Act of 1956.

25.     Prior to the petition date, Capitol operated subsidiary banks in seventeen states that provided customers with banking, trust and other financial services and products. In addition to commercial banking services, Capitol's subsidiary banks provided customers with trust services, mortgage origination and servicing, equipment leasing, brokerage and investment advisory services, property and casualty insurance, life insurance and annuity products and portfolio management services.

26.     Some of Capitol's subsidiary banks were state chartered banks, and subject to supervision and regulation by state organizations and the FDIC. Capitol also operated depository institutions that were chartered as federal savings banks that were regulated by the Office of the Comptroller of the Current ("OCC") and the FDIC.

27.     Beginning in 2007, Capitol and its banking subsidiaries experienced increases in nonperforming loans, foreclosed real estate and loan losses. In particular, Capitol's banking subsidiaries suffered significant losses in performance loans such as real estate construction and development loans.

28.     Capitol's subsidiary banks experienced significant capitol erosion and incurred operating losses starting in 2008.

29.     In fact, Capitol's last year of profitability was 2007. In 2008, Capitol lost approximately $29 million; in 2009, approximately $195 million; in 2010, the loss grew to $225 million; and in 2011, Capitol lost $45 million.

30.     As a holding company, Capitol was required to maintain certain capital levels in accordance with banking regulations, and a consolidated capital position sufficient to support the capital requirements of its banking subsidiaries.

31.    By 2009, Capitol's financial soundness and capital position had deteriorated to the point where the Board of Governors of the Federal Reserve System stepped in to implement changes in Capitol's operations.

32.    On September 21, 2009, Capitol and the Federal Reserve Bank of Chicago ("Reserve Bank") entered into an agreement ("Federal Reserve Agreement") whereby, among other provisions, Capitol was prohibited from: (i) declaring or paying any dividends without prior written approval of the Reserve Bank and the Director of the Division of Banking Supervision and Regulation of the Board of Governors of the Federal Reserve System; (ii) directly or indirectly taking dividends or any other form of payment representing a reduction in capital from Michigan Commerce Bank; (iii) incurring, increasing, or guaranteeing any debt without the prior written approval of the Reserve Bank; and (iv) purchasing or redeeming any shares of its own stock, shares of its subsidiary holding companies' stock, or any subsidiary banks' stock held by shareholders.

33.    In addition to the aforementioned prohibitions, the Federal Reserve Agreement required Capitol to take the following actions: (i) submit to the Reserve Bank an acceptable written plan to maintain sufficient capital at Capitol on a consolidated basis, and as a separate legal entity; (ii) notify the Reserve Bank no more than 30 days after the end of any quarter in which Capitol's consolidated capital ratios fell below the approved capital plan's minimum ratios; (iii) review and revise its allowance for loan and lease losses methodology for loans held by Capitol; (iv), take all necessary actions to ensure that each of its subsidiary depository institutions complied with the Federal Reserve Act and Regulation W of the Board of Governors; (v) submit to the Reserve Bank an acceptable written plan to enhance the consolidated organization's risk management practices; and (vi) submit to the Reserve Bank within 30 days

6

after the end of each calendar quarter a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of the Federal Reserve Agreement.

34.     Beginning in 2009, the Reids embarked on a plan to raise capital for Capitol by divesting and consolidating some of its banks and redeploying the resources to its remaining banks. This plan was doomed from the start as Capitol's own projections calculated a $48 million deficit between the sales proceeds and Capitol's anticipated required capital contributions by 2011.

35.     By March 2012, Capitol had an equity deficit approximating $121.3 million, and was under increased regulatory scrutiny due to its classification by the FDIC of being less than "adequately capitalized."

36.     On August 9, 2012, with no ability to raise sufficient capital to keep its operation running, Capitol filled its voluntary petition for bankruptcy in Case No. 12-58409 in the United States Bankruptcy Court for the Eastern District of Michigan.

**The Corporate Jet**

37.     Despite Capitol's severe financial problems, Joseph Reid decided in 2008 that he wanted to lease a private jet.

38.     Accordingly, in August, 2008, Joseph Reid caused Capitol Capital, LLC ("CC") to be formed for the purpose of leasing a jet.

39.     Capitol was the sole member and manager of CC.

40.     CC's operating agreement provides that Capitol shall not be liable for the acts, debts or liabilities of CC.

41.     On August 29, 2008, CC entered into a lease agreement with Canal Air, LLC, pursuant to which, CC leased a Cessna Citation Sovereign, Model 680 airplane valued at $16,800,250.

42.     Pursuant to the lease, CC paid Canal Air monthly payments of $89,984.

43.     At all relevant times, Capitol provided CC with capital infusions in order to pay for the corporate jet.

44.     In 2011, with Capitol's financial troubles mounting, CC returned the corporate jet.

45.     Rather than simply returning the jet and limiting any attendant liabilities for breaching the lease with CC, Joseph Reid allowed the Capitol board to negotiate a transaction on Capitol's behalf, pursuant to which, CC's obligations under the lease were converted to a note that was guaranteed by Capitol.

46.     By allowing the board to negotiate the transaction, Reid permitted the board to usurp Reid's own authority to act in an executive fashion and exceed its own authority under the Michigan Business Corporations Act.

47.     Accordingly, on or about October 13, 2011, CC executed a note, guaranteed by Capitol, pursuant to which, CC and Capitol were obligated to pay Canal Air $88,544.10 per month beginning in November, 2011.

48.     Despite never having any liability under the lease, Capitol became obligated for CC's repayment obligations under the note at a time when it was insolvent.

49.     From October, 2011 through August, 2012, Capitol made 11 payments to CC totaling $840,000, which CC used to make the note payments to Canal Air.

### The Reids' Management of Capitol for Personal Gain

50.     At all relevant times, Capitol was a publicly traded company.

51.     Despite their obligations to Capitol's shareholders, the Reids operated a publicly traded company as a family business, and consistently acted in a manner that put insiders and family members ahead of shareholders.

52.     The Reids also personally benefited from acting as landlords to the commercial property Capitol leased for its principal offices.

53.     Michigan to Business & Trade Center Limited ("<u>Michigan to Business</u>") is a Michigan limited partnership of which Joseph Reid and Lewis Johns are partners. Capitol and its subsidiary bank, Capitol National Bank, leased its principal offices from Michigan to Business.

54.     Despite only paying rent of $622,340 in 2010, in 2011 Capitol and Capitol National Bank paid rent of $982,135—a 50% increase from the prior year—to Michigan to Business for their principal offices in Lansing, Michigan.

55.     In 2012, Capitol and Capitol National Bank paid rent of $735,856 to Michigan to Business for their principal offices in Lansing, Michigan.

56.     As the landlord of Capitol's principal offices, Joseph Reid arbitrarily defined Capitol's yearly rent payments and charged Capitol above-market rent for his personal benefit.

57.     R & A Development is a limited Michigan limited partnership of which Joseph Reid and Lewis Johns are partners. Capitol leased un-used space in the building adjacent to its principal offices from R & A Development.

58.     Despite only paying rent of $218,057 in 2010, in 2011 Capitol paid rent to R & A Development in the amount of $260,196—a 20% increase over the prior year—for the use of the adjacent, un-used building.

59.     In 2012, Capitol paid rent to R & A Development in the amount of $154,951 for the use of the adjacent, un-used building.

60.     As the landlord of Capitol's adjacent rented building, Joseph Reid arbitrarily defined Capitol's yearly rent payments and charged Capitol above-market rent for his personal benefit.

### Capitol's Officers Deplete Capitol's Reserves with Ineffective Capital Infusions

61.     The FDIC Improvement Act of 1991 establishes categories of capitalization by which to rank banking institutions. The categories, "well-capitalized," "adequately capitalized," "undercapitalized," and "significantly-undercapitalized" are based on the ratio of an institution's Tier 1 capital to its average total assets.

62.     Banks that are "significantly undercapitalized" fall significantly below the required minimum level for any relevant capital measure. Capital measures for purposes of FDIC classifications include a bank's total risk-based capital ratio, the bank's Tier 1 risk-based capital ratio and the bank's leverage ratio.

63.     Capitol's subsidiary banks that were classified as "significantly undercapitalized" had a Tier 1 leverage ratio of between 2% and 3%.

64.     A "well-capitalized" depository institution has a Tier 1 leverage ratio of at least 5% or more.

65.     In 2011 and 2012, the following Capitol subsidiary banks were classified as "significantly undercapitalized" by the FDIC:

        a. Sunrise Bank of Arizona;
        b. Sunrise Bank of Georgia;
        c. Pisgah Community Bank;
        d. Bank of Las Vegas;
        e. Central Arizona Bank; and

f.  1st Commerce Bank.

66.  Despite evidence of the subsidiary banks' inadequate capital ratio and the obvious pending failures of the subsidiary banks, the Reids made the indefensible decision to inject millions of dollars of capital into Sunrise Bank of Georgia, Pisgah Community Bank, Central Arizona Bank, 1st Commerce Bank, and Sunrise Bank of Arizona in 2011 when Capitol was insolvent.

67.  On March 31, 2011, Capitol made a capital infusion to Sunrise Bank of Georgia in the amount of $240,000.

68.  On July 29, 2011, Capitol made the following capital infusions to its failing subsidiary banks:

a.  Wire transfer of $141,200 to Central Arizona Bank;
b.  Wire transfer of $211,800 to Pisgah Community Bank;
c.  Wire transfers of $3,236,000 and $1,000,000 to Sunrise Bank of Arizona;
d.  Wire transfers of $1,386,269.49 and $261,045.48 to Sunrise Bank of Georgia; and
e.  Wire transfer of $847,200 to 1st Commerce Bank.

69.  On December 30, 2011, Capitol made the following capital infusions to its failing subsidiary banks:

a.  Wire transfer of $425,000 to 1st Commerce Bank;
b.  Wire transfer of $175,000 to Central Arizona Bank; and
c.  Wire transfer of $850,000 to Sunrise Bank of Georgia.

70.  As executive officers of Capitol, the Reids knew or should have known Sunrise Bank of Georgia, Pisgah Community Bank, Central Arizona Bank, 1st Commerce Bank and Sunrise Bank of Arizona were not only "significantly undercapitalized" in 2011, but destined to fail regardless of the capital infusions.

71.  In total, the Reids caused Capitol to make capital infusions in the amount of $8,533,515 to the failing subsidiary banks in 2010 and 2011 when Capitol was insolvent.

11

72.    The Reids also caused Capitol to make capital infusions in the amounts of $4,724,000 and $1,600,000 to Bank of Las Vegas on December 31, 2010 and December 30, 2011, respectively.

73.    Capitol's capital infusions into its banking subsidiaries depleted Capitols' diminishing assets and Capitol received nothing in return for the transfers.

### *Capitol's Officers Enter into Worthless Assignment Agreements*

74.    In 2012, despite Capitol's increasing equity deficit, Defendants caused Capitol to enter into several assignment agreements with subsidiary banks to channel money out of Capitol.

75.    On March 29, 2012, Capitol entered into an assignment agreement with Sunrise Bank of Georgia, a Capitol subsidiary, for the purchase of charged off loans.

76.    Pursuant to the agreement, Sunrise Bank of Georgia assigned Capitol the collection proceeds from certain charged off loans in exchange for Capitol making a cash payment of $1,325,000 on or before April 30, 2012.

77.    In the assignment agreement, the parties represented that Sunrise Bank of Georgia desired "to reduce its legal and operating costs" and that Capitol was "willing to bear such expenses."

78.    The outstanding amount on the charged off loans that Sunrise Bank of Georgia assigned was $788,073.52.

79.    On March 30, 2012, Capitol made the first payment on account of the assignment agreement in the amount of $525,000.

80.    Capitol never made any efforts to collect on any of these charged off loans assigned from Sunrise Bank of Georgia.

81.    Capitol never collected on any of the charged off loans assigned from Sunrise Bank of Georgia.

82.    On March 20, 2012, Capitol entered into an assignment agreement with Pisgah Community Bank, a Capitol subsidiary, for the purchase of charged off loans.

83.    Pursuant to the agreement, Pisgah Community Bank assigned Capitol the collection proceeds from certain charged off loans in exchange for Capitol making a cash payment of $650,000 on or before April 30, 2012.

84.    In the assignment agreement, the parties represented that Pisgah Community Bank desired "to reduce its legal and operating costs" and that Capitol was "willing to bear such expenses."

85.    The outstanding amount on the charged off loans that Pisgah Community Bank assigned was $944,189.43.

86.    On March 30, 2012, Capitol made the first payment on account of the assignment agreement in the amount of $450,000.

87.    Capitol never made any efforts to collect on any of these charged off loans assigned from Pisgah Community Bank.

88.    Capitol never collected on any of the charged off loans assigned from Pisgah Community Bank.

89.    On March 30, 2012, Capitol made a payment to 1st Commerce Bank in the amount of $175,000 which, on information and belief, was on account of an assignment for the purchase of charged off loans.

90.     On March 30, 2012, Capitol made a payment to Central Arizona Bank in the amount of $100,000 which, on information and belief, was on account of an assignment for the purchase of charged off loans.

91.     In total, Capitol made payments in the amount of $1,250,000 for worthless charged off loans that it never made any effort to collect on and, in fact, for which it never received any benefit.

92.     Capitol entered into all the aforementioned assignment agreements when the subsidiary banks were "significantly-undercapitalized" and failing, and when Capitol was also undercapitalized and unable to meet its financial obligations.

93.     Capitol received no actual value for the assigned charged off loans.

94.     The entrance into assignment agreements for worthless charged off loans contributed to the deteriorating financial condition of Capitol.

### *Capitol's Officers Make Unauthorized Post-Petition Transfers*

95.     While operating Capitol as a debtor-in-possession, the Reids made unauthorized post-petition transfers to failing subsidiary banks, including improper capital infusions into its subsidiary banks.

96.     In September 2012, Capitol made the following unauthorized post-petition transfers into subsidiary banks:

    a.   Wire transfer of $4,025.68 to Indiana Community Bank;
    b.   Wire transfers of $17,880.21 and $23,491.23 to Central Arizona Bank;
    c.   Wire transfers of $43,273.85 and $47,930.59 to Pisgah Community Bank;
    d.   Wire transfers of $46,630.41 and $49,235.98 to Sunrise Bank of Georgia;
    e.   Wire transfer of $61,470.62 to Bank of Las Vegas.

14

97.    In September 2012, Capitol made the following unauthorized capital infusions into subsidiary banks:

     a.  Wire transfer of $95,000 to Sunrise Bank of Georgia; and
     b.  Wire transfers of $217,000 to Bank of Las Vegas.

98.    As executive officers, the Reids knew of, and authorized the September 2012 post-petition transfers and capital infusions to subsidiary banks.

99.    The September 2012 transfers to subsidiary banks were unauthorized, and against the financial interests of Capitol.

100.    In October 2012, the Reids made the following unauthorized capital infusions into subsidiary banks ("October 2012 Transfers"):

     a.  Wire transfer of $210,160 to Sunrise Bank of Arizona;
     b.  Wire transfer of $219,100 to Central Arizona Bank;
     c.  Wire transfer of $286,260 to Pisgah Community Bank; and
     d.  Wire transfer of $570,000 to Sunrise Bank of Georgia.

101.    As executive officers, the Reids knew of, and authorized the October 2012 Transfers to failing subsidiary banks.

102.    The October 2012 transfers to subsidiary banks were unauthorized, and against the financial interests of Capitol.

103.    The Reids authorized a total of $1,891,458.57 in imprudent, unauthorized post-petition transfers to failing subsidiary banks in violation of the automatic stay imposed on debtors pursuant to the Bankruptcy Code.

104.    The Reids authorized the September and October 2012 Transfers when they were aware, or should have been aware, that such transfers were insufficient to sustain the subsidiary banks.

*Subsidiary Banks Finally Fail, and Capitol sells Bank of Las Vegas*

15

105.    On May 10, 2013, Sunrise Bank of Georgia was closed by the Georgia Department of Banking and Finance, and the FDIC was appointed as receiver.

106.    On May 10, 2013, Pisgah Community Bank was closed by the North Carolina Office of the Commissioner of Banks, and the FDIC was appointed as receiver.

107.    On May 14, 2013, Central Arizona Bank was closed by the Arizona Department of Financial Institutions, and the FDIC was appointed as receiver.

108.    On June 6, 2013, 1st Commerce Bank was closed by the FDIC.

109.    On August 23, 2013, Sunrise Bank of Arizona was closed by the Arizona Department of Financial Institutions, and the FDIC was appointed as receiver.

110.    In November 2013, the Reids caused Capitol to sell Bank of Las Vegas for a fraction not only of its book value, but for millions of dollars less than the total infusions made by Capitol in December 2010 and 2011.

111.    In November 2013, the Reids sold Bank of Las Vegas as part of a bulk sale with its other subsidiary banks Michigan Commerce Bank, Sunrise Bank of Albuquerque and Indiana Community Bank. The total sale price for the assets of Bank of Las Vegas, Michigan Commerce Bank, Sunrise Bank of Albuquerque and Indiana Community Bank was approximately $6.5 million.

112.    At the time of sale, Bank of Las Vegas had Tangible Equity Capital in the amount of $5,353,000, representing 11% of the total Tangible Equity Capital sold in the bulk sale.

113.    Capitol received approximately $715,000 for the sale of Bank of Las Vegas, when Bank of Las Vegas' assets were valued at $5,353,000.

114.    The Reids caused Capitol to infuse $6,541,000 into Bank of Las Vegas in 2010, 2011 and 2012 only to realize $715,000 from its sale.

16

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Fiduciary Duty of Care Against Joseph Reid, Cristin Reid and Brian English
(Failure to Receive Adequate Value for Purchases of Worthless Charged Off Loans)**

115.    Plaintiff hereby incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    As officers of Capitol, the Defendants owed fiduciary duties to Capitol to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Reids reasonably believed to be in Capitol's best interests.

117.    The Defendants' fiduciary duties required them to (1) protect Capitol against further diminution in value of its assets; (2) ensure Capitol received reasonable value for the purchase of charged off loans from its subsidiary banks; and (3) exercise oversight to ensure that efforts were made to enable Capitol to collect proceeds on any assigned charged off loans from its subsidiary banks.

118.    The Defendants' breached these fiduciary duties by entering into assignment agreements pursuant to which Capitol paid a premium for worthless charged off loans, and then never directing any efforts be made to collect proceeds on any of the those purchased charged off loans. In so doing, the Defendants' conduct was not in good faith, care, and devotion to the best interest of Capitol as required of corporate fiduciaries under Michigan law.

119.    As a result of the aforesaid breaches, the Defendants' damaged Capitol in an amount no less than $1,250,000 to be proven at trial by depleting Capitol's assets at a time when Capitol was in severe financial distress and on the brink of filing for bankruptcy.

17

## COUNT II
**Breach of Fiduciary Duty of Care against Joseph Reid and Cristin Reid**
**(Failure to Preserve Capitol's Pre-Petition Assets)**

120.    Plaintiff hereby incorporates by reference and ralleges each and every allegation set forth above, as though fully set forth herein.

121.    As officers of Capitol, the Reids owed fiduciary duties to Capitol to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Reids reasonably believe to be in Capitol's best interests.

122.    These duties required the Reids to (1) maintain adequate levels of capital assets for Capitol so that it could meet all its financial obligations; (2) ensure that transfers of capital to subsidiary banks were in the best interests of Capitol as primary shareholder of subsidiary banks; (3) prevent the needless transference of capital to subsidiary banks classified as "significantly undercapitalized" and destined for failure; (4) prevent Capitol from depleting its assets by artificially prolonging financial existence of failing subsidiary banks.

123.    The Reids breached these fiduciary duties by continuing to make capital contributions to subsidiary banks when they knew the capital infusions were insufficient to prevent the banks from their certain failure. The Reids' decision to continue making unnecessary capital contributions to failing, subsidiary banks substantially diminished Capitol's assets. In so doing, the Reids' conduct was not in good faith, care, and devotion to the best interest of Capitol as required of corporate fiduciaries under Michigan law.

124.    As a result of the aforesaid breaches, the Reids damaged Capitol in an amount no less than $14,857,515 to be proven at trial by depleting Capitol's assets at a time Capitol was in severe financial distress and on the brink of filing for bankruptcy.

## COUNT III
**Breach of Fiduciary Duties of Care and Loyalty against Joseph Reid and Cristin Reid**
**(Authorizing Improper Post-Petition Transfers)**

125.     Plaintiff hereby incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126.     On August 9, 2012, Capitol continued its operations as a debtor-in-possession under relevant provisions of the Bankruptcy Code.

127.     As officers of a debtor-in-possession, the Reids continued to owe fiduciary duties to Capitol to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Reids reasonably believe to be in Capitol's best interests.

128.     As officers of a debtor-in-possession, the Reids owed Capitol's creditors the highest duties of care and loyalty to act in the best interest of Capitol, and to conserve and protect assets of Capital's estate.

129.     The Reids had a duty not to authorize improper and unpermitted post-petition transfers to failing subsidiary banks.

130.     The Reids breached their fiduciary duties of care and loyalty to Capitol by authorizing post-petition transfers to failing, and "significantly undercapitalized" subsidiary banks without seeking court approval.

131.     As a result of the aforesaid breaches, the Reids damaged Capitol in an amount no less than $1,891,458.57 to be proven at trial by failing to conserve Capitol's post-petition assets.

## COUNT IV
### Breach of Fiduciary Duty of Care against Joseph Reid
### (Unnecessarily Incurring Liability)

132.    Plaintiff hereby incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    As an officer of Capitol, Joseph Reid owed a fiduciary duty to Capitol to act with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in Capitol's best interests.

134.    Reid breached his fiduciary duty of care by ordering the board of directors, which did not act independently without his approval, to convert CC's lease liability, for which Capitol was not liable, into a note, the payment of which was guaranteed by Capitol.

135.    As a result of the aforesaid breach, Capitol incurred damages in an amount no less than $840,000 to be proven at trial.

## COUNT V
### Breach of Fiduciary Duty of Good Faith and Loyalty Against Joseph Reid
### (Self-Dealing)

136.    Plaintiff hereby incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137.    Joseph Reid was a partner of Michigan to Business and R & A Development.

138.    Michigan to Business and R & A Development leased property to Capitol for use as its principal offices and additional space in a building adjacent to its principal offices.

139.    Joseph Reid, as an officer of Capitol, had a personal interest in Capitol's leases with Michigan to Business and R & A Development.

140.    Capitol's 2011 and 2012 lease with Michigan to Business and R & A Development were not fair to Capitol at the time they were entered into.

141.    Joseph Reid personally profited from charging Capitol above-market rent for the leasing of its principal offices and of the building adjacent to its principal offices.

142.    Joseph Reid's conduct as an officer of Capitol and partner in Michigan to Business and R & A Development constitutes self-dealing.

143.    As a result of Joseph Reid's self-dealing, Capitol has damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in favor of Plaintiff, on behalf of the Liquidation Trust of Debtors, against Defendants Joseph Reid, Cristin Reid, and Brian English and awarding damages in an amount no less than $18,838,973 to be proven at trial.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues triable by jury.

_____/s/ Edward P. Perdue_____
EDWARD P. PERDUE (P55888)
DICKINSON WRIGHT PLLC
200 Ottawa Avenue, NW, Ste. 1000
Grand Rapids, MI 49503
Phone: (616) 458-1300
Fax: (616) 458-6753
Email: EPerdue@dickinsonwright.com

Jeffrey L. Widman
(Application for Admission Forthcoming)
Shaw Fishman Glantz & Towbin LLC
321 N. Clark Suite 800
Chicago, IL 60654
main: (312) 541-0151
direct: (312) 980-3807
fax: (312) 980-3888
jwidman@shawfishman.com
www.shawfishman.com

*ATTORNEYS FOR PLAINTIFF*

Dated:  August 8, 2014

GRAPIDS 99993-723 332209v2

22